**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-702 (JEB)** |
| **JULIO BAQUERO,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Julio Baquero to 27 months of incarceration, in the middle of his advisory guidelines range, three years of supervised release, $2,000 in restitution, and a $100 special assessment.

## I.    INTRODUCTION

Baquero was an active participant in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Baquero entered the Capitol through the Upper West Terrace Door, hearing the piercing sound of the security alarm, and past the signs that read "Emergency Exit." He climbed the steps to the Rotunda, and walked around the Capitol for about 10 minutes before returning to the Rotunda. Observing a confrontation between rioters and police on the west side of the Rotunda, Baquero rushed to join in, adding his body weight to the rioters pushing against police.

After that effort failed, Baquero joined another confrontation against officers. During this altercation, Baquero grabbed the hand of an officer holding a police baton, and shouted at the police that they were "traitors." Though aware that police were clearing the Rotunda, Baquero stayed inside that room as long as he could, leaving only when the police forced rioters out. Instead of leaving the building, Baquero remained in the East Rotunda Door lobby outside the east door to the Rotunda. As officers tried to shut the entrance doors to keep rioters from reentering, Baquero rushed the officers, pushing against one of the doors with such force that it took two officers to pry Baquero from the door. Baquero remained in the East Rotunda Door lobby, leaving the Capitol building only after police regained control of the area, and staying on Capitol grounds rather than leaving the scene.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers to the court to the stipulated Statement of Offense filed in this case, ECF 41, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.      Baquero's Role in the January 6, 2021 Attack on the Capitol**

On January 4, 2021, Baquero traveled from his home in Florida to Washington, D.C., with

co-defendant Valentin. After attending the rally, Baquero and Valentin walked to the Capitol, and

crossed fallen barricades, past rioters engaging with police, to enter the Capitol Grounds (ECF 41,

¶ 9).

They arrived on the west side of the Capitol and climbed under the scaffolding set up for

the Inauguration. At around 2:41, Baquero, followed by Valentin, walked up the Northwest steps

towards the Upper West Terrace. *See* Exhibit 1.



*Figure 1: Screenshot from Ex. 1 at 0:22*

Baquero stopped half-way up the steps to wait for Valentin. *See* Exhibit 2. As he did,

nearby rioters commented on the pepper spray being used by police against rioters. *See Id*.



*Figure 2: Screenshot from Ex. 2 at 0:16*

Baquero went immediately to the Upper West Terrace Door, entering the Capitol through

that point at about 2:45 p.m., followed by Valentin. *See* Exhibit 3.



*Figure 3: Screenshot from Ex. 3 at 0:06*

As Baquero entered, it was obvious to him that this was not an approved entrance to the

Capitol. He heard a piercing security alarm, saw cardboard boxes stacked on either side of the

hallway, and passed signs reading, "Emergency Exit Only. PUSH UNTIL ALARM SOUNDS." *See* Exhibit 4.[2]



*Figure 4: Screenshot from Ex. 4 at :07, with close-up*

After entering the building, Baquero and Valentin climbed a set of steps to the Rotunda.



*Figure 5: Screenshot from Security Video at approximately 2:46 p.m.*

---

[2] Exhibit 4 is cellphone video taken by another rioter entering at the Upper West Terrace Door around the time of Baquero's and Valentin's entrance.

Valentin and Baquero exited through the north entrance of the Rotunda, towards the Senate. Rioters' progress along this path to the Senate was successfully blocked by police at this time, and Valentin and Baquero returned to the Rotunda about 10 minutes later. *See* Exhibit 5.

At approximately 3:01 p.m., Baquero and Valentin saw a confrontation between rioters and police at the west entrance to the Rotunda. They moved towards the confrontation, and Valentin (indicated in red) watched as Baquero (indicated in green) ran towards the police. *See id.*, at 0:35.



*Figure 6: Screenshot from Ex. 5 at 0:35*

The confrontation consisted of a group of rioters pushing the police out of the west entrance of the Rotunda, chanting "USA!" *See* Exhibit 6. After one rioter yelled, "Let's Go!" and waived more rioters over, Baquero joined the push, adding to the force being used against the police. *See id.*



*Figure 7: Screenshot from Ex. 6 at 1:03*

The police successfully resisted the attack, and Baquero and the other rioters were pushed back inside the Rotunda. Baquero rejoined Valentin, and the two stood together near the west entrance, as additional police entered the Rotunda in preparation for a joint effort to push rioters out of the room. *See* Ex. 5 at 2:18. As the officers moved forward, rioters began physically resisting, and Baquero joined them.

At approximately 3:04 p.m., Baquero put himself at the front line of rioters confronting police. During the confrontation, he reached out and grabbed the hand of officer R.L., who was holding a police baton. *See* Exhibit 7.[3]

---

[3] Exhibit 7 is a slowed-down excerpt from the officer's body-worn camera footage.



*Figure 8: Screenshot from Ex. 7 at :09*

Baquero continued to confront officers aggressively, reaching after them and calling them "traitors." *See* Exhibit 8.



*Figure 9: Screenshot from Ex. 8 at 0:10*

Despite instructions from the police to leave, Baquero and Valentin remained in the Rotunda, moving back only when forced to by the advancing line of police. *See* Exhibit 9.

8

Eventually, Baquero and Valentin moved towards the outer perimeter of the Rotunda, watching other rioters' confrontations with police. *See Id.*



*Figure 10: Screenshot from Ex. 9 at 0:19*

The police continued to pushed rioters out of the Rotunda through the east entrance, which consists of two large wooden doors swinging out to the lobby outside the east entrance. *See* Exhibit 10 at 0:01 - 0:06. Valentin and Baquero stayed on the perimeter, watching other rioters, but not attempting to leave. *See id.* at 0:45 – 0:50. When the police line finally got to them, Baquero and Valentin exited through the east entrance, among the last rioters to leave the Rotunda.

Rather than continue to the East Rotunda Door to exit the Capitol building, Baquero and Valentin remained in the lobby, just outside the east entrance of the Rotunda, for several minutes. *See* Exhibit 11.



*Figure 11: Screenshot from Ex. 11 at 0:42*

At about 3:19 p.m., Baquero, still standing close to the east entrance, saw that officers were trying to shut the double doors in order to prevent rioters from returning to the Rotunda. Baquero ran towards the doors, intent on stopping the officers from closing them. *See* Exhibit 12 at 0:40. Baquero pushed one of the doors open and braced his back against the door, using his body weight to keep it open. *Id.* at 0:44 - 0:48, As officers approached, he then grabbed door, refusing to let go. It took the concerted efforts of two USCP officers to pry Baquero from the door. *Id.* at 0:49 - 0:57. After being torn away from the door, Baquero pushed one of the officers away from him. *Id*. at 0:59 - 1:00. *See also* Exhibit 13.[4]

---

[4] Exhibit 13 is open source video showing the same incident seen on security video.





*Figures 12 and 13: Screenshots from Ex. 12 at 0:57, 0:59*

After this third confrontation with police, Baquero walked to the opposite wall, sitting on

a bench next to the East Rotunda Door. *See* Exhibit 14 at 0:35 - 0:45 (indicated in green). Baquero

remained on the bench, watching rioters clash with police. *See id*. at 0:50 – 4:00. At about 3:21,

rioters surged in through the East Rotunda Door, and Baquero stood up on the bench to watch. *See*

Exhibit 15 at 0:03. While watching the rioters fight with police, Baquero was hit with pepper spray and sat down again. *See id.* at 3:21. Though other rioters exited at this time, Baquero stayed, and did not exit the Capitol building through the East Rotunda Door until about 3:34 p.m., having been inside about 50 minutes. ECF 41, ¶ 15.

Though he had left the building, Baquero did not leave the Capitol Grounds. He remained on the steps outside the East Rotunda Door, rejoined Valentin, and took photos, including a selfie on the East Steps of the Capitol.



*Figure 14: Photo taken by Baquero*

Baquero also walked around to the West Side of the Capitol, and was still there, taking photographs, when police had retaken the Northwest steps.



*Figure 15: Photo taken by Baquero*

*Defendant's FBI Interviews*

On April 12, 2021, Baquero voluntarily agreed to speak with the FBI. Baquero admitted he travelled to Washington, D.C. with Valentin, and "marched" to the Capitol after the former President's "Stop the Steal" rally ended. Baquero minimized his conduct, claiming that an unknown person told him "Come in! Come in!" and that the doors to the Capitol were open, implying that his entry was peaceful and legitimate. In reality, Baquero entered through an emergency door to the sounds of a piercing alarm.

Baquero admitted that once inside the Capitol, he told Valentin, "This feels like a trap" because not many people entered behind them. Baquero also admitted seeing a rioter try to kick down a door and another try to hand out a fire extinguisher to him and others. But Baquero continued to minimize his own conduct. He falsely claimed that he and Valentin voluntarily chose to leave the Capitol once Valentin saw someone with a knife. He also falsely claimed that while trying to leave, a police officer helped clear a path for them. In reality, Baquero and Valentin did not leave the Capitol voluntarily – they exited separately after being forced out by the police, and

13

at no point did police clear a path for them.

Baquero also falsely claimed that he was not involved in any violence and had no run-ins with law enforcement. As discussed above, Baquero attacked and repeatedly interfered with officers while in the Capitol.

On October 28, 2021, after he was arrested, Baquero waived his *Miranda* rights and agreed to be interviewed again. He identified himself and Valentin in images taken from inside the Capitol on January 6. When shown a photo of himself reaching out to grab the baton held by Officer R.L., he claimed he must have been pushed forward by someone. As shown in Exhibit 7, Baquero was not pushed; he intentionally reached out for Officer R.L.

### III.   THE CHARGES AND PLEA AGREEMENT

On December 1, 2021, a federal grand jury returned an indictment charging Baquero with six counts, including, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Assaulting, Resisting or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). On February 16, Baquero was convicted of Civil Disorder based on a guilty plea entered pursuant to a plea agreement.

### IV.   STATUTORY PENALTIES

Baquero now faces sentencing on one count of Civil Disorder, in violation of 18 U.S.C.

§ 231(a)(3).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Baquero faces up to five years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The U.S. Probation Office calculated Baquero's criminal history as category I, which is not disputed. PSR ¶ 52. Accordingly, based on the government's calculation of Baquero's total offense level, after acceptance of responsibility, at 17, Baquero's Guidelines imprisonment range is 24 to 30 months' imprisonment. The plea agreement contains an agreed-upon Guidelines range calculation that mirrors this calculation.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Baquero's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Baquero was not only a part of the larger riot, but he personally

and repeatedly used physical force to interfere with police efforts to defend the Capitol and clear rioters from the building. Although no physical injuries have been tied to Baquero's conduct, his conduct served to incite and embolden those rioters who did succeed in injuring officers and destroying property.

The nature and circumstances of Baquero's offense were of the utmost seriousness, and fully support the government's recommended sentence.

**B.     The History and Characteristics of the Defendant**

Baquero has no criminal history and, apart from a few positive urine samples, has been compliant with the conditions of his pre-trial release.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Baquero's criminal conduct, illegally entering the Capitol, repeatedly attacking the officers inside, and directly and physically obstructing their efforts to clear rioters from Capitol, was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

16

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

While Baquero's statement to probation claims he felt remorse immediately after his actions on January 6, it is difficult to reconcile that claim with his April 2021 FBI interview, in which he minimized his conduct and denied having been involved in any violence, and his post-arrest statement in which he claimed he was "pushed" into Officer R.L. Moreover, while some January 6 defendants pled guilty promptly, Baquero did not accept responsibility for his actions for over a year after his arrest. The government submits that there is still a need to deter Baquero from choosing violence in pursuit of his political goals.

### E.       The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by

17

professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and

18

balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[7]

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Thomas Hamner*, 21-cr-00689-ABJ, the defendant breached the perimeter fencing around the Capitol and joined with other rioters to wrestle away barricades erected to keep the mob from entering the restricted area. He and a group of rioters shoved a large, metal-framed billboard towards police officers on the West Plaza, but did not strike them. Like Baquero, Hamner was charged with violations of both § 231(a)(3) and §111(a)(1), but pled guilty only to a violation of § 231(a)(3). Judge Berman Jackson sentenced Hamner to 30 months in prison.

In *United States v. Moises Romero*, 21-cr-677-TSC, the defendant joined other rioters to push a temporary barrier against officers who were using it to prevent them from entering the Senate Wing Door. Like Baquero, Romero pled guilty to violating Section 231(a)(3), but Baquero's conduct was more serious. Romero had only one interaction with the police; Baquero had three. Romero did not directly assault any officers; Baquero pushed against police, grabbed the hand of an officer holding a police baton, and fought with officers trying to close a door. Because of the differences in conduct, Romero faced an advisory sentencing range of 8-14 months, lower than Baquero. Judge Chutkan sentenced Romero to 12 months and 1 day, in the middle of his advisory guideline range. Here, Baquero faces a higher guideline range, and so a mid-range sentence is correspondingly higher.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[8] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Baquero must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Baquero played in the riot on January 6.[9] Plea Agreement at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Architect of the Capitol in mid-May 2021. *Id.* Baquero's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 117.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months of incarceration, in the middle of his advisory guidelines range, three years of supervised release, $2,000 in restitution, and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:      *Robert Juman*
Robert Juman
Assistant United States Attorney
Bar No. NJ 033201993
United States Attorney's Office, Detailee
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (786) 514-9990
E-mail: Robert.juman@usdoj.gov