# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                            **CASE NO. 21-CR-00702 (JEB)**

**JULIO BAQUERO,**

    **Defendant.**

_____/

## JULIO BAQUERO'S SENTENCING MEMORANDUM AND REQUEST FOR A DOWNWARD VARIANCE

Julio Baquero, through undersigned counsel, and pursuant to 18 U.S.C. § 3553(a), submits the following memorandum in support of his request for a downward variance.

**1.  The Court Should Vary Downward Based Upon Mr. Baquero's History and Characteristics.**

On January 6, 2021, thousands of people went to Washington, D.C., at the request of the then-President of the United States, to attend the "Stop the Steal" rally. There, several prominent people spoke. The speakers included, among others, the President, sitting members of Congress, a law professor, the President's attorney, and the Texas Attorney General. And, consistent with the theme of the rally, the

1

speakers complained about a stolen election. At the end of the rally, the President urged the attendees to march to the Capitol. Julio Baquero was one of those in attendance. And while President Trump does not regret what he unleashed on January 6th,[1] Mr. Baquero is deeply ashamed of his conduct that day and will spend the rest of his life atoning for his actions.  PSR ¶ 38.

To be clear, however, Mr. Baquero did not travel from Hollywood, Florida, to Washington, D.C., to march to the Capitol or to unlawfully enter the building, and certainly not to obstruct law enforcement officers. Instead, and as the following photos attest, he came from Florida to take in the historical sights and attend what he believed would be President Trump's last rally the next day. PSR ¶ 38.

[space intentionally left blank]

---

[1] S*ee, e.g.*, https://thehill.com/homenews/ campaign/3998884-trump-on-cnn-says-jan-6-rioters-had-love-in-their-heart (President Trump at CNN "Town Hall": "I've never spoken to a crowd as large as this," Trump said of that day. "That was because they thought the election was rigged. And they were there proud. They were there with love in their heart. That was an unbelievable, and it was a beautiful day.").





There is no dispute that Mr. Baquero unlawfully entered the Capitol Building, acted offensively and inappropriately, grabbed the hand of a police officer just trying to do his job, and interfered with other law enforcement officers. While Mr. Baquero's conduct was wrongful, it is important to note that he did not carry a weapon or convert an everyday item to a weapon, nor did he punch, kick, or spray any officer with an irritant. He did not come dressed in or carrying any form of tactical gear. And he had no preconceived intent to go to the Capitol or engage with law enforcement officers that day.

After Mr. Baquero left the Rotunda, he sat near the exit door for about fifteen minutes.



In his letter to the Court, Mr. Baquero wrote about what he was experiencing in the photo above: "I snapped back to reality and realized that this was all wrong. I made my way towards the exit, but it was really crowded. I noticed some chairs by the exit doors and sat down with my head down because I felt really bad for what I did and put myself through. I sat down for what felt like 10 to 15 minutes feeling remorse, regretting what I did, praying for forgiveness . . .."  PSR ¶ 38.

Mr. Baquero's actions on January 6th were an aberration. Despite a challenging and difficult childhood, he has never been in trouble with the law. PSR at ¶¶ 50-51. At an early age, Julio's father abandoned the family. PSR at ¶ 59.  As a result, he grew up in relative poverty, having to move constantly, with food and shelter not guaranteed. PSR at ¶ 59. Despite these hardships, aside from a minor traffic infraction, Julio has, until the events of January 6th, led a law-abiding life. PSR at ¶¶ 50-51, 53.

Moreover, notwithstanding the instability of his childhood, Mr. Baquero has forged, with Amy Ruiz, his partner since the 8th grade, a stable, productive, and happy home for themselves and their three children. PSR at ¶¶ 62-63. As Ms. Ruiz wrote in her letter to the Court:

"At the age of 19 Julio became a father to our oldest son. Being a father became his number one priority in life and he made the decision to leave a high paying job with cruise ships in order to not travel and be present to raise his son. Julio and I have been together for over 20 years, and I don't know anyone more patient and understanding than him." (Exhibit A-Letter from Amy Ruiz).

Additionally, Mr. Baquero has given back to his community by coaching baseball. Mr. Baquero has been a baseball coach in his community since 2011—first as an assistant coach on a recreational team and later as an assistant coach at a local public high school. At the same time, Mr. Baquero coached a summer travel team of students from different high schools as well as for his son's travel team.

Cindy Soler has written about her and her son's positive experiences with Mr. Baquero:

> [o]ver the course of these past two years, I have had the privilege of getting to know Mr. Baquero intimately, as he has served as the baseball coach for my son, Aiden. From the outset, Mr. Baquero has been nothing short of instrumental in my son's life. He has helped Aiden develop not only his baseball skills but also his confidence, fostering a deeper love for the game than ever before. His ability to interact with the children, to guide them, and to show them different ways of performing both on and off the field is commendable. Mr. Baquero's sincere passion for the sport is evident in the way

he interacts with the team. His commitment goes beyond the game itself; he ensures that the children understand and appreciate the sport's values, instilling in them a sense of respect and sportsmanship. Regardless of the outcome of each game, Mr. Baquero finds the strength to congratulate the children, thus maintaining their confidence and promoting positivity—a trait that is hard to come by.

(Exhibit B-Letter from Cindy Soler). Another mom, Carmelina Farias, echoed those sentiments: "He has been known to be helpful and charitable and is a much-loved person by all. He has coached young children from optimist clubs through high school. It takes a special person to have the patience and commitment to volunteer hundreds of hours to our youth." (Exhibit C-Letter from Carmelina Farias); (*see also* Exhibit D-Letter from Lymari Guzman).



Mr. Baquero acknowledges that his actions on January 6th are inexcusable. In her letter to the Court, Ms. Ruiz discusses how Mr. Baquero has processed his actions on January 6th: "He has been remorseful of actions since the day the incident happened, knowing that what he did was wrong. I spoke to him that same evening and he himself couldn't understand why he did what he did. He has been filled with so much regret since before he even left that building. He has been so disappointed with himself, you could even say depressed." (Exhibit A-Letter from Amy Ruiz).

As the Court knows, 18 U.S.C. § 3553(a) mandates that a court "impose a sentence sufficient, but not greater than necessary, to comply

with" federal sentencing goals by looking to the statutory factors listed under § 3553. And given his challenging childhood, stable long-term relationship with his partner and children, work history, community involvement, lack of prior involvement with the criminal justice system, and remorse for his actions, his aberrational conduct on January 6th warrants a downward variance from the advisory guideline range.

**2.    The Court Should Vary Downward Because the Guidelines Overstate Mr. Baquero's Culpability.**

A downward variance is also warranted because the advisory guidelines overstate Mr. Baquero's culpability. Mr. Baquero pled guilty to committing Civil Disorder under 18 U.S.C. § 231(a)(3) but the USSC has not indexed the offense of Civil Disorder to any particular guideline. In the absence of an expressly promulgated guideline, USSG § 2X5.1 directs the Court to apply the most analogous guideline, USSG § 2A2.4—Obstructing or Impeding Officers.  Notwithstanding, to resolve his case, Mr. Baquero agreed that the PSR should set the base offense level for his count of conviction—Civil Disorder—using USSG § 2A2.2, the aggravated assault guideline. Notwithstanding, USSG § 2A2.2 overstates his culpability and recommends a sentence far greater than necessary under 18 U.S.C. § 3553(a).

The federal assault statute incorporates the common-law definition of assault as (1) "a willful attempt to inflict injury upon the person of another" or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm." *United States v. Dat Quoc Do*, 994 F.3d 1096, 1099–100 (9th Cir. 2021); *see also United States v. Cua*, No. CR 21-107 (RDM), 2023 WL 2162719, at *5 (D.D.C. Feb. 22, 2023).

In the Statement of Offense that supported Mr. Baquero's plea, the parties agreed that while inside the Rotunda, he "grabbed the hand of MPD Officer R.L., who was holding a police baton." (DE 41:5). While Mr. Baquero unlawfully grabbed Officer R.L.'s hand, he did not willfully attempt to inflict injury, nor did he threaten to inflict injury upon the officer—the elements required for assault.

In contrast to simple assault, USSG § 2A2.2 defines "aggravated assault" to mean a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another

felony. USSG § 2A2.2, comment (n.1). Assuming for purposes of this discussion that Mr. Baquero committed a simple assault, he did not commit an aggravated assault.

Mr. Baquero did not use a dangerous weapon, inflict serious bodily harm, or strangle or suffocate anyone (or attempt those acts). Therefore, the only basis for § 2A2.2 is if Mr. Baquero committed any assault with "an intent to commit another felony." USSG § 2A2.2, comment (n.1).

But the "Civil Disorder" offense cannot be "another felony" for purposes of the cross-reference at § 2A2.2. Mr. Baquero's grabbing of Officer R.L. cannot constitute both the assault and the "other felony" of Civil Disorder. For an offense to properly be considered "aggravated" or more serious, there must logically be evidence that shows that Mr. Baquero intended some other crime. The evidence as admitted during the change of plea, and contained in the PSR, does not show that Mr. Baquero intended to commit a felony other than Civil Disorder when he grabbed Officer R.L.'s hand. PSR ¶¶ 27, 28.[2]

---

[2]  Indeed, the crime of Civil Disorder itself does not require that the defendant *intend* to commit a civil disorder. A court in this district recently found that the commission of Civil Disorder under 18 U.S.C. § 231(a)(3) requires the government to prove that the defendant "committed, or attempted to commit, an act with the intent to obstruct,

The Aggravated Assault guideline is clearly intended to apply when the defendant has a larger, felonious purpose, which is not borne out by the evidence here. The brevity of Mr. Baquero's conduct also matters. He grabbed Officer R.L.'s only for a moment.

Judge Berman Jackson confronted this same issue in *United States v. Hamner*, 21-CR-00689-ABJ, and agreed with our position. This is a brief summary of the *Hamner* facts from the government's sentencing memorandum: "On January 6, 2021, Hamner was in Washington D.C. Once on restricted grounds of the U.S. Capitol, Hamner opportunistically attacked the police line, pulling away barricades and then assisted to ram a large billboard, a dangerous weapon when used as Hamner did, directly onto police officers protecting the entry point . . .." *United States v. Hamner*, 21-CR-00689 (ABJ), DE 38:12.

On May 17, 2022, Hamner pled guilty, like Mr. Baquero, to Count Two of his indictment that charged Civil Disorder and Aiding and Abetting. (DE 28:1-2).  In *Hamner*, the government alleged he assaulted

---

impede, or interfere with law enforcement officers who were lawfully carrying out their official duties incident to a civil disorder." *United States v. Reffitt*, 2022 U.S. Dist. LEXIS 81138 at 16 (May 4, 2022) (Friedrich, J.).

Capitol Police and Metropolitan Police Officers by violently pushing a large and heavy metal sign onto the line of police officers. (*Hamner*, DE 43:46) (AUSA: "I want to be clear: The sign did not, as the memo put it, lumber towards the officers. It was lifted, it was carried, it was pushed, and it was heavy and it was huge. The video exhibits capture, along with the photographs, Mr. Hamner's posture and his effort. He's putting his back and his legs into it.").   According to the government, Hamner's conduct reflected a threat that caused reasonable apprehensions of fear and a "willful attempt to inflict injury upon" the officers. (*Hamner*, DE 28:20).

In *Hamner*, unlike here, the government agreed that USSG § 2A2.4-Obstructing or Impeding Officers applied.  (*Hamner,* DE 28:24). But the government asserted that USSG § 2A2.4(c)'s cross-reference should be used. (*Hamner,* DE 28:24). As noted above, § 2A2.4(c) provides (1)  If  the  conduct  constituted  aggravated  assault,  apply § 2A2.2 (Aggravated Assault). The government argued, among other things, that Hamner's assault "involved . . . an intent to commit another felony." (*Hamner,* DE 28:21) ("Hamner's felonious assault 'involved . . . an intent to commit another felony.' [] Here, the interference with police

during a civil disorder in violation of 18 U.S.C. § 231(a)(3) involved the

intent to commit the felony violation of assaulting, resisting, or impeding

certain officers (18 U.S.C. § 111(a)(1) and (b))").

Judge Berman Jackson disagreed:

It strikes me that if the Commission is asking: Did you commit the assault with the intent to commit some other offense? It didn't mean with the intent to commit that exact same assault, just charged differently. They could have easily defined 'another offense' as any offense with any different elements that's a different offense, but they didn't. It's also important to note that the cross reference says you go to aggravated assault if the assault on the police officer involved the intent to commit another felony, not the same intent needed to satisfy the elements of another felony, not that it was committed during the commission of another felony. *This suggests that the guideline is meant to cover just the situation in the cases that you cited, where the assault on the police officer is intended to facilitate or further or advance or succeed in the commission of or evasion of apprehension for a second, different crime.*

(*Hamner*, DE 43:20-21) (emphasis added).

Ultimately, Judge Berman Jackson held:

Therefore, given the fact that the showing necessary for the application of the cross reference under subsection A has not been made, given the government's inability to produce evidence to establish the defendant's intent to cause bodily injury by a preponderance of the evidence, given the circularity involved in the government's proposal, that I find that subsection D applies, and that is that the assault, which is the offense of conviction, involved an intent to commit another felony when the other felony is the exact same assault

14

> that likely wouldn't be a felony unless it was committed with the intent to commit another felony. And finally, at best, the cross reference is ambiguous. And under such circumstances the Rule of Lenity requires the adoption of the definition that favors the defendant.

(*Hamner*, DE 43:23-24).

In summary, Hamner pled guilty to the same offense to which Mr. Baquero has pled—18 U.S.C. § 231(a)(3)—Civil Disorder. While Mr. Baquero and Hamner had different primary guidelines, the operative issue is the same—whether an assault that formed the basis of the civil disorder offense may be deemed "another felony" to "aggravate" the offense. Judge Berman Jackson, as discussed above, ruled no. This Court should do so as well for the reasons cited by Judge Berman Jackson.[3]

---

[3] Judge Berman Jackson sentenced Hamner to 30 months' imprisonment based upon the following findings: a Base Offense Level of 10, a three-level upward adjustment for physical contact, a two-level downward adjustment for acceptance of responsibility, and a Criminal history Category of V which led to a range of 24-30 months. (*Hamner*, DE 43:22-24). The court found that Hamner had five prior felony convictions, several involving violent assaults on women. *Id.* at 50. The court also found there were "ongoing problems with compliance with [Hamner's] conditions of supervision." *Id.* Judge Berman Jackson found that "the record reflects a current theme of disrespect for law enforcement, fleeing from arrest, resisting arrest, and disrespect for courts in general when you bragged about that in this case. *Id.* Finally, the court noted that upon his arrest, Hamner told the officers, "You're lucky I ain't running and making you go through hell right now. Just look at my rap sheet. I'm

18 U.S.C. § 3553(a) makes clear that the statute not only allows but requires an independent judicial evaluation of the seriousness of the offense and "just punishment," 18 U.S.C. § 3553(a)(2)(A), separate and apart from the "nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and the requirements of the guidelines, 18 U.S.C. § 3553(a)(4). Under section 3553(a), a court may vary downward based upon the guideline overstating the defendant's culpability. *See, e.g., United States v. Cavera*, 550 F.3d 180, 192 (2d Cir. 2008) ("a district court may find that . . . there is a wide variety of culpability amongst defendants and, as a result, impose different sentences based on the factors identified in § 3553(a).").

Under the PSR, using USSG §2A2.2 (Aggravated Assault), Mr. Baquero's advisory guideline range is 24-30 months. By comparison, using USSG § 2A2.4 (Obstructing or Impeding Officers) without applying the cross-reference, with a three-level increase for physical contact and a two-level decrease of acceptance of responsibility, his guideline range would be 8-14 months in Zone B. Assessing Mr. Baquero's relative

---

a runner and I'm a fighter, but ain't that today because I know that I've been doing right." *Id.*

culpability, the Court should consider this significant difference in fashioning a just and reasonable sentence.

**3. The Court Should Vary Downward Based Upon the USSC's "Zero Point Offender" Proposed Amendment.**

Finally, the Court should consider the USSC's recently promulgated amendment to USSG § 4C1.1. This amendment—effective November 1st—would reduce the total offense level by two points for zero-point defendants meeting the following criteria, all of which Mr. Baquero meets:

> (1) the defendant did not receive any criminal history points from Chapter Four, Part A;
>
> (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism);
>
> (3) the defendant did not use violence or credible threats of violence in connection with the offense;
>
> (4) the offense did not result in death or serious bodily injury;
>
> (5) the instant offense of conviction is not a sex offense;
>
> (6) the defendant did not personally cause substantial financial hardship;
>
> (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);

(9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and

(10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848.

A two-level reduction of Mr. Baquero's total offense level from the aggravated assault guideline (USSG 2A2.2) would yield an advisory range of 18 to 24 months. A two-level reduction of Mr. Baquero's total offense level from the obstructing or impeding officers guideline (USSG 2A2.4) would set a range of 4 to10 months.

The newly adopted amendment reflects the Sentencing Commission's judgment that the current guidelines, at least in the case of first-time offenders with zero criminal history points, yield sentences that are too high. And only a few months from now, sentences imposed in cases like this one will be anchored by guidelines that are lower than those applicable to Mr. Baquero's case today. Thus, a sentence below the guideline range here would be appropriate both to accurately reflect Mr. Baquero's conduct and history based on the Sentencing Commission's

most updated thinking, and to avoid unwarranted disparities whether looked at in terms of historical trends or directives that will apply to similarly situated defendants in the immediate future.

For Mr. Baquero, the key question in this case is whether he "use[d] violence or credible threats of violence . . . in connection with the offense." USSG § 4C1.1 (proposed). According to Black's Law Dictionary, the term "violence" means "[t]he use of physical force, usually accompanied by fury, vehemence, or outrage; esp. physical force unlawfully exercised with the intent to harm." Black's Law Dictionary 1601 (8th ed. 2004). Like Black's Law Dictionary, courts also have defined the "use of physical force" to be "synonymous with destructive or violent force." *See, e.g., United States v. Landeros-Gonzales,* 262 F.3d 424, 426 (5th Cir. 2001) (cleaned up). This reading comports with the Supreme Court's holding in *Johnson v. United States,* 559 U.S. 133 (2010) where the Court held that "'actua[l] and intentiona[l] touching'"—the level of force necessary to commit common-law misdemeanor battery—did not require the "degree of force" necessary to qualify as a "violent felony" under ACCA's elements clause. Under this reading, while Mr. Baquero actually and intentionally touched Officer R.L., he did not use the degree

of force that the law recognizes as violent. Because he meets all the criteria, the Court should consider the proposed amendment to USSG § 4C1.1 in fashioning Mr. Baquero's sentence.

**4.      Based on the Foregoing, the Court Should Vary Downward in Fashioning a Just Punishment for Mr. Baquero.**

In imposing "just punishment" for an offense, a sentencing court should not disregard the additional penalties and hardships that will accompany Mr. Baquero's conviction—the loos of his civil rights and perhaps ability to coach youth sports—and his low risk of recidivism. As previously noted, he has no criminal history, which places him in a Criminal History Category I. As a first-time offender, Mr. Baquero poses a lower risk of recidivism. *See United States v. Urbina*, 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"). Finally, in considering a variance in this case, this Court should consider the length of time that Mr. Baquero—who is 39 years old—abstained from criminal conduct prior to his commission of the instant offense. *United States v.*

*Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

Mr. Baquero recognizes he committed a grave and serious offense for which he has no excuse. But given his challenging childhood, stable long-term relationship with his partner and children, work history, community involvement, lack of prior involvement with the criminal justice system, and remorse for his actions, his aberrational conduct on January 6th warrants a downward variance from the advisory guideline range.

Respectfully Submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

By: *Michael Caruso*
        Florida Bar No. 051993
        150 W. Flagler Street, Suite 1500
        Miami, Florida 33130
        Tel: 305-530-7000/Fax: 305-536-4559
        E-Mail: Michael_Caruso@fd.org

## CERTIFICATE OF SERVICE

I HEREBY certify that on **May 16, 2023**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*Michael Caruso*